**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | | |
|---|---|---|
| ALBERT ADAMS, JR., | : | No. 4 WAP 2025 |
| | : | |
| Appellant | : | Appeal from the Order entered |
| | : | December 27, 2024, of the |
| | : | Commonwealth Court at No. 563 |
| v. | : | MD 2017. |
| | : | |
| | : | SUBMITTED:  March 26, 2026 |
| COMMONWEALTH OF PENNSYLVANIA, | : | |
| OFFICE OF THE ATTORNEY GENERAL, | : | |
| | : | |
| Appellee | : | |

## OPINION

**JUSTICE McCAFFERY**                                        **DECIDED: JULY 21, 2026**

In this direct appeal, we consider whether the Commonwealth Court erred by granting summary relief in favor of Appellee, the Pennsylvania Office of the Attorney General (the OAG), regarding Appellant's, Albert Adams, Jr.'s, claim under Pennsylvania's Whistleblower Law (the Whistleblower Law).[1]  The Commonwealth Court determined that Adams failed to place evidence in the record capable of establishing that any adverse employment action taken by the OAG was caused by his good faith report of sexual and racial harassment of an intern by a coworker.  We conclude the Commonwealth Court erred.  Specifically, we hold that Adams provided sufficient evidence demonstrating a causal link between the OAG's adverse employment actions and his good faith report.  We therefore vacate the Commonwealth Court's order and

---

[1] Act of December 12, 1986, P.L. 1559, *as amended*, 43 P.S. §§ 1421-1428.

remand for further proceedings to consider whether Adams established the remaining requirements for a *prima facie* case under our Court's precedent.

I.       FACTS & PROCEDURAL HISTORY

On December 6, 2017, Adams, a Narcotics Agent II, filed a complaint in the Commonwealth Court's original jurisdiction against his employer, the OAG, alleging a violation of the Whistleblower Law.  Eventually, on December 6, 2021, Adams filed a third amended complaint (Complaint).   In this Complaint, Adams argued that, after he submitted a good faith report of sexual and racial harassment, the OAG violated Section 3(a) of the Whistleblower Law by denying him multiple promotions and employment opportunities.[2]

The Complaint, except when noted, advanced the following allegations.  On March 28, 2017, Adams witnessed Agent Tom Moore (Agent Moore), a fellow narcotics agent, sexually and racially harass a white female intern over the course of eight hours, as they executed search warrants.  *See* Complaint, 12/6/2021, at ¶¶ 18-20; Brief in Support of Adams' Opposition to the OAG's Application for Summary Relief, 3/15/2024, at 3-4. Agent Moore harassed the intern by directing sexually explicit language at her, suggesting she would like to have a sexual relationship with a Black perpetrator, and asking what her

---

[2] Section 3(a) of the Whistleblower Law provides:

> **(a) Persons not to be discharged.--**No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 P.S. § 1423(a).

parents would think of such a relationship. Two other narcotics agents with the OAG — Agent Matthew Massaro (Agent Massaro) and Agent Mark Sinisi (Agent Sinisi) — were also present and witnessed this harassment. A few days later, Adams reported this incident (the 2017 Report) to Agent Barry Howe, then Acting Regional Director. The OAG investigated this incident, obtaining statements from Adams, Agent Massaro, and Agent Sinisi. On July 17, 2017, the OAG issued a written reprimand to Agent Moore for "unbecoming conduct." *See* R.R. 462a (Moore Written Reprimand). Despite this reprimand, Agent Moore continued to work in a supervisory role at the OAG.

On April 19, 2017, Adams interviewed for a promotion to Narcotics Agent III. In July 2017, he learned he did not receive this promotion and Agent Dave Jordan (Agent Jordan) was promoted instead. One month later, Adams requested an assignment with the Safe Streets program operated out of Johnstown, Pennsylvania. Individuals in the Safe Streets program are eligible to earn approximately $18,000 per year in overtime. Adams' request was denied, and Agent Howe informed him that the Safe Street positions were assigned to two Cambria County sheriff's deputies. In actuality, the positions were assigned to Agent Moore and Agent Thomas Brandt (Agent Brandt). In Fall 2017, Adams applied for two vacant Narcotics Agent III positions. Adams was not hired for either opening, and Agent Moore and Agent Brandt were promoted instead.

Subsequently, at a staff meeting, the OAG announced that in order to be eligible for a promotion to Narcotics Agent III, any Narcotics Agent II must be a Field Training Agent. An agent interested in becoming a Field Training Agent was asked to notify Agent Howe. Adams sent Agent Howe a memorandum expressing his interest in becoming a Field Training Agent. Around November 30, 2017, Adams learned that four other agents, including Agent Moore and Agent Sinisi, were selected to become Field Training Agents and were booked for a Field Training Agent course on December 4, 2017. According to

Adams, he was the only agent who applied for the two vacant Narcotic Agent III positions in Fall 2017 that was not selected to attend the Field Training Agent course.

In November 2018, Adams applied for a Narcotics Agent III Gun Violence Unit position. Adams did not receive this promotion, and the promotion went to Agent Sinisi instead. In July 2021, Adams applied for the Regional Director position in the State College Regional Office in the Bureau of Narcotics Investigation and Drug Control. Again, Adams did not receive this position, and the position went to Agent Brandt. Adams claims he was the most qualified and experienced applicant for each of these positions, but he was denied these opportunities in retaliation for submitting the 2017 Report concerning Agent Moore's alleged sexual and racial harassment.

The Complaint also alleged that Agent Moore and Agent Howe belonged to a clique of employees inside the OAG. According to Adams, employees within this clique would do personal favors for other members of the group and assist each other in employment decisions and promotions. In Adams' pretrial statement, he expounded on this theory and explained that a "boys' club" existed in the OAG, and it included several employees, such as Agent Moore, Agent Howe, and Agent Brandt. *See* R.R. 93a (Adams' Pretrial Statement). He claimed that members of this "boys' club" would "exchange[] favors and gifts, and assist[] one another in obtaining promotions within the OAG." *Id.*

On March 1, 2024, following the close of discovery, the OAG filed an application with the Commonwealth Court seeking summary relief in its favor and alleging Adams failed to establish a *prima facie* case of retaliation under Section 3(a) of the Whistleblower

Law.[3]   Specifically, the OAG asserted Adams was unable to establish a "causal connection" between the 2017 Report and any adverse employment actions.[4]

Adams vehemently rejected the OAG's arguments concerning the purported lack of causal connection.  *See* Brief in Support of Adams' Opposition to the OAG's Application for Summary Relief at 27-37.  He highlighted evidence in the record that was capable of establishing a causal connection.  First, Adams noted that, after filing his report, he was denied four separate promotions, an opportunity to earn overtime in the Safe Streets program, and the opportunity to advance his career by participating in the Field Training Agent course.  *See id.* at 33.  Second, Adams pointed to an incident in February 2022 involving Agent Michael Page (Agent Page), his direct supervisor.  Agent Page reduced Adams' overall performance rating from "outstanding" to "commendable" purportedly

---

[3] To prove a violation of the Whistleblower Law, an employee "must show by a preponderance of the evidence that, prior to the alleged reprisal, the employee or a person acting on behalf of the employee had reported or was about to report in good faith, verbally or in writing, an instance of wrongdoing or waste to the employer or an appropriate authority."  43 P.S. § 1424(b).  As pertinent here, "wrongdoing" refers to "[a] violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."  43 P.S. § 1422.  In a case concerning purported retaliation, an employee must show a "causal connection" between their good faith report of wrongdoing and an adverse employment action.  *Golaschevsky v. Dep't of Env't Prot.*, 720 A.2d 757, 759 (Pa. 1998).

[4] The OAG also argued the 2017 Report was not a good faith report of wrongdoing because Adams and Agent Moore were competing for the same Narcotics Agent III position, and Adams was "self-interested in taking actions that could materially improve his position vis-à-vis other candidates for his desired promotion."  *Adams v. Off. of Att'y Gen.*, 563 M.D. 2017, 8 (Pa. Cmwlth. filed Dec. 27, 2024) (unreported).  In addition, the OAG claimed the 2017 Report was not made in "good faith" because Adams reported Agent Moore's harassment due to his feelings of "malice" and "ill will towards Agent Moore."  *Id.* at 9.  The OAG further argued the 2017 Report did not concern any "wrongdoing" encompassed by the Whistleblower Law.  Brief in Support of the OAG's Application for Relief in the Nature of a Motion for Summary Judgment, 3/1/2024, at 7-9 (*citing* 43 P.S. § 1422).  The OAG maintained that Adams' report of sexual harassment was "[o]bjectively … nothing more than a peccadillo report about one of his fellow employees."  *Id.* at 9 (citation omitted).

"because Agent Brandt would not accept the evaluation with the overall rating of 'outstanding' and Agent Brandt had [the] final say."[5] *Id.* at 14-15 (italics and citation omitted). Third, Adams relied upon Agent Jordan's deposition, where he testified to the following: (1) Agent Howe did not want to assign Adams to the Safe Streets program, and he said he would "give up" the Safe Streets positions rather than "give it to [Adams;]" (2) an OAG prosecutor called Adams a "rat fuck" for submitting the 2017 Report; and (3) the 2017 Report was "certainly a factor" as to why Adams was not promoted to one of the two Narcotics Agent III positions in the Fall 2017.[6] *Id.* at 30, 33 (citations and emphasis omitted). Fourth, Adams cited Agent Duane Musser's (Agent Musser) deposition, where he testified that Agent Brandt should not have been promoted over Adams and that Adams was a better candidate. *See id.* at 34. Lastly, Adams claimed "the record establishe[d] that [he] was the most qualified and experienced applicant for the promotions and career opportunities at issue, and more qualified than the successful

---

[5] By way of background, in February 2022, Agent Page completed the standard annual performance evaluation form for Adams, and in his original evaluation, Agent Page's overall performance rating for Adams was "outstanding." *See* Michael Page Deposition, 9/13/2022, at 36-37 (italics omitted). After receiving Agent Page's initial evaluation, Agent Brandt told him that he disagreed with Adams' overall rating of "outstanding" and asked Agent Page to talk with two OAG attorneys who worked with Adams. *See id.* at 37-39 (italics omitted). Agent Page met with the two attorneys, and neither objected to his assessment of Adams. Furthermore, the two attorneys said nothing that changed Agent Page's opinion as to Adams' performance. According to Adams, Agent Page eventually dropped his overall rating to "commendable" only "because Agent Brandt would not accept the evaluation with the overall rating of 'outstanding' and Agent Brandt had [the] final say." Brief in Support of Adams' Opposition to the OAG's Application for Summary Relief at 14-15 (italics and citation omitted). Lastly, Adams observed that Agent Page testified he had "prepared approximately forty or fifty performance evaluations and this [was] the only time a supervisor ha[d] ever refused to accept his evaluation." *Id.* at 16 (emphasis and citation omitted).

[6] Agent Jordan also testified that the 2017 Report "played a role" in Adams not being promoted to Narcotics Agent III position in Fall 2017 and "contributed" to Agent Howe's decision to not assign Adams to one of the Safe Streets positions. *See* David Jordan Deposition, 8/10/2021, at 33, 40.

applications," and in support, attached his resume along with the resumes of Agents Jordan, Moore, Brandt, and Sinisi. *Id.* at 34-35 (citations omitted).

In a single-judge, unreported decision, the Commonwealth Court agreed with the OAG and found that Adams failed to establish a causal connection between the 2017 Report and any adverse employment actions. *See Adams*, 563 M.D. 2017, at 12-22. As a result, the Court granted the OAG's application for summary relief and dismissed Adams' Complaint.[7] *See id.* at 23. To reach this conclusion, the Court reviewed "all facts of record and reasonable inferences therefrom in a light most favorable to [Adams], the non-moving party." *Id.* at 2 n.2 (citation omitted). Setting forth its standard of review, the Court explained:

> In ruling on a motion for summary relief, the evidence must be viewed in the light most favorable to the non-moving party and the court may enter judgment only if: (1) there are no genuine issues of material fact; and (2) the right to relief is clear as a matter of law. This right to relief may be granted only in cases where the right is clear and free from doubt.

*Id.* at 6 (citations, brackets, and internal quotation marks omitted).

The Court then reviewed recent precedent interpreting the Whistleblower Law. To establish a violation of the Law for retaliatory employment actions, an "employee must show a **causal connection** between the report of wrongdoing and the [adverse employment actions]." *Adams*, 563 M.D. 2017, at 7 (emphasis in original) (*citing Javitz v. Luzerne Cnty.*, 293 A.3d 570, 579 (Pa. 2023)). Unsupported conclusions about a post-report hostile work environment are insufficient to demonstrate the required causal connection. *See id.* (*citing Javitz*, 293 A.3d at 583 n.16). Instead, an employee must allege "concrete facts" from which the factfinder can reasonably infer that the employer's

---

[7] The Commonwealth Court rejected the OAG's arguments that the 2017 Report was not a "good faith" report because Adams was motivated by personal interest or malice towards Agent Moore. *See Adams*, 563 M.D. 2017, at 8-12. That issue is not part of this appeal. Notably, the Court did not address the OAG's argument that, under the Whistleblower Law, the 2017 Report did not concern a "wrongdoing."

conduct was antagonistic. *Id.* at 14 (emphasis omitted) (*citing Javitz*, 293 A.3d at 582). Neither "temporal proximity" nor direct "evidence of antagonism" is required — "proximity or antagonism merely provides an evidentiary basis from which an inference [of retaliation] can be drawn." *Id.* at 7 (*citing McAndrew v. Bucks Cnty. Bd. of Comm'rs*, 982 F. Supp. 2d 491, 505 (E.D. Pa. 2013)).

Turning to the facts, the Court recognized that Adams' Complaint alleged multiple instances of denied promotions after he submitted the 2017 Report. However, relying on the above-mentioned case law, the Court found these allegations "standing alone, [were] insufficient to establish a causal connection[.]" *Adams*, 563 M.D. 2017, at 16 (citation omitted). The temporal proximity between the 2017 Report and the numerous instances of Adams not being promoted were not sufficient to prove a causal connection. *See id.* at 16-17. The Court also determined that the Complaint's allegations were nothing more than Adams' "perception of how others treated him after he made the … report." *Id.* (citation and brackets omitted). As to Adams' assertions concerning Agent Page and his performance evaluation, the Court determined that Agent Brandt did not accept Agent Page's original evaluation because Agent Page had not been Adams' supervisor for the entire year. *See id.* at 12 n.10. As such, the Court implied that this incident could not be considered an adverse employment action because there was a benign explanation for Agent Brandt's conduct.

The Court placed great significance on Adams' assertion regarding a "boys' club" in the OAG and found this claim "undermine[d] his" arguments concerning causation.[8] *Adams*, 563 M.D. 2017, at 17. The Court observed that "the various positions [Adams] claims he did not achieve due to retaliation for the [2017] Report were given to members

---

[8] The OAG's Application for Summary Relief did not claim a boys' club existed or that such a boys' club explains all the adverse employment actions against Adams.

of what [Adams] referred to as the boys' club." *Id.* (italics omitted). In the Court's view, the existence of the boys' club provided the complete explanation for why Adams had not been promoted. In support, the Court cited Agent Jordan's deposition, where he claimed: (1) the 2017 Report was not the "specific reason" why Adams was not assigned to the Safe Street program; and (2) it was "known for years" that certain agents, including Agent Howe, "didn't like [Adams], so they weren't really going to help him out." *Id.* at 18-19 (citation and emphasis omitted). Considering Agent Jordan left the OAG in September 2017, the Court concluded his statement — that it was "known for years" Agent Howe did not like Adams — referred to years **prior to** the 2017 Report. *See id.* In further support of its interpretation, the Court cited Agent Musser's testimony that "people from Blair County got hired over others consistently" and that "Blair County was their own little clique, they all knew each other, did favors for each other, took care of each other." *Id.* at 19-20 (citation and emphasis omitted).

The Court concluded that Adams' own evidence indicates he was passed over for desired promotions because of the preferential treatment given to members of the boys' club, not because of the 2017 Report. *See Adams*, 563 M.D. 2017, at 20. All of Adams' evidence of antagonism following the 2017 Report had no bearing on causation because, in the Court's view, "the antagonistic behavior was the same before and after the [2017] Report[.]" *Id.* at 21 (citation omitted). Thus, the facts, as put forth by Adams, supported a finding that favoritism and the boys' club were the true reasons behind his inability to be promoted, and his Complaint could not establish a causal connection between the 2017 Report and any adverse employment actions. *See id.* at 20.

The Court also noted the contradictory allegations in the Complaint concerning Agent Sinisi. In the Court's view, Adams' Complaint averred that OAG agents "directed derogatory comments and hostility" at Agent Sinisi, due to his "good faith report of

harassment." *Adams*, 563 M.D. 2017, at 20 (citation omitted). However, the Complaint also alleged Agent Sinisi was one of the agents contacted by the OAG about becoming a Field Training Agent, and the Complaint noted that Agent Sinisi eventually was promoted to the Narcotics Agent III Gun Violence Unit position. *See id*. The Court viewed the fact that one of the agents involved in the underlying incident detailed in the 2017 Report, was promoted made it "**less likely** that retaliation for the [2017] Report was the reason [Adams] was not himself selected for any of the various positions[.]" *Id.* at 20-21 (emphasis added).

The Court also found it significant Adams testified that Agent Howe encouraged him to file the March 2017 report, and Agent Moore was disciplined as a result. *See Adams*, 563 M.D. 2017, at 21. In its view, the "concrete facts and surrounding circumstances" alleged in the Complaint "merely reflect the OAG's agreement that Agent Moore's conduct should have been reported and required discipline, which the OAG issued." *Id.* at 22 (italics omitted).

Having assessed the Complaint's allegations, the Court determined that, even considering the evidence in a light most favorable to the non-moving party, Adams could not prove causation between the 2017 Report and the OAG's repeated decisions not to promote him. Instead, his "objective evidence" showed that his lack of promotion was a consequence of him not being a member of the boys' club. *Adams*, 563 M.D. 2017, at 22. As such, the Court concluded that Adams failed to establish a *prima facie* case of causation as required by the Whistleblower Law. *See id*.

Adams appealed to this Court for review of the Commonwealth Court's determination, and we ordered his appeal to be submitted on the briefs, without oral argument. *See* Order, 4 WAP 2025.

## II.     ARGUMENTS OF THE PARTIES

From the outset, Adams emphasizes that the Whistleblower Law only asks an employee to "come forward with **some evidence** of a connection between the report of wrongdoing and the alleged retaliatory acts."  Adams' Brief at 22 (emphasis in original) (*citing Javitz*, 293 A.3d at 584).  "[E]stablishing a *prima facie* case in this context is not intended to be onerous."  *Id.* at 22-23 (italics added) (*citing Golaschevsky*, 720 A.2d at 761 (Nigro, J., concurring)).  According to Adams, the Commonwealth Court misapplied the law, utilized a heightened standard, and selectively underscored certain facts while inexplicably ignoring other evidence of probative value.

Adams does not dispute that an employee's "subjective perception" is insufficient for a *prima facie* case of causation.  Adams' Brief at 29 (*citing Javitz*, 293 A.3d at 585).  But here, Adams contends the Commonwealth Court erred by dismissing the entirety of his evidence as being his "subjective perception."  *Id.*  Adams emphasizes that he presented "evidence of fact, not perception" and highlights the following: (1) an attorney at the OAG called him a "rat fuck," (2) Agent Brandt pressured Agent Page to lower his performance evaluation, and (3) he was the only agent who applied for the Narcotics Agent III positions who was not selected to attend the Field Training Agent course.  *Id.*  Adams also notes he provided the Court with the resumes of the individuals who were promoted over him, showing they objectively had far less experience, training, and certifications.  *See id.* at 30.  Relying on *Carpenter v. William Penn School District*, 295 A.3d 22 (Pa. Cmwlth. 2023), Adams argues that resumes are objective evidence concerning the relative experience of candidates, and the Court should have considered this objective evidence instead of disregarding it.  *Id.*

Adams asserts the Commonwealth Court improperly applied a heightened standard by requiring him to provide direct evidence demonstrating the OAG threatened

him with adverse employment actions after he submitted the 2017 Report. *See* Adams' Brief at 32. He argues these errors are "directly analogous" to the missteps in *Javitz*, which this Court overturned on appeal. *Id.* at 33. He claims the Commonwealth Court, in both cases, "mischaracterized evidence of fact as 'subjective perception,' neglected to include additional evidence of post-reporting antagonism, and seemingly required nothing less than evidence in the form of the proverbial 'smoking gun' to establish causation." *Id.* at 37.

Adams argues the Commonwealth Court strayed by not viewing the record in the light most favorable to him, the non-moving party. *See* Adams' Brief at 38. In particular, he challenges its "improper inference" that any adverse employment actions against him were the result of him not being a member of the boys' club, as opposed to the 2017 Report. *Id.* at 39. Adams insists that, even if his Complaint supports the existence of a boys' club at the OAG, this finding does not refute his arguments linking the 2017 Report to the adverse employment actions. *See id.* He faults the Commonwealth Court for "ignor[ing] the potential for, if not likelihood of, retaliation against [him] filing a report of sexual and racial harassment against a member of the 'boys' club.'" *Id.* Furthermore, Adams argues that any evidence proving the existence of a boys' club can be read in his favor because his evidence also established "the threat of retaliation for filing a complaint against one of its members." *Id.* at 40. In support, he highlights Agent Musser's testimony describing "a fear [or] concern of retaliation in the office." *Id.* (citation omitted).

Adams rejects the Commonwealth Court's position that there is a "reasonable, non-retaliatory explanation" for why Agent Page ultimately lowered his assessment of Adams. Adams' Brief at 25. He argues the record does not support the Court's conclusion that Agent Brandt refused to accept Agent Page's initial rating of "outstanding" because Agent Page only had been Adams' supervisor for seven months. *See id.*

(emphasis omitted). To counter the Commonwealth Court's finding, Adams points to Agent Page's testimony that he changed Adams' performance rating to "commendable" only so that Agent Brandt would accept it. *See id.* at 27 (emphasis omitted).

Adams also challenges the Commonwealth Court's finding that the OAG encouraged him to submit the 2017 Report, which the Court used as "evidence of the lack of a causal connection." Adams' Brief at 45-46, 48 (citation and internal quotation marks omitted). In support, he points to testimony that purportedly indicates the OAG tried to prevent the victim of Agent Moore's harassment from submitting a fully accurate report. *See id.* at 46-47. Likewise, Adams disputes the Court's reasoning that the OAG's alleged discipline of Agent Moore undermines Adams' assertion of a causal connection. *See id.* at 48. Adams emphasizes that Agent Moore was never suspended or demoted due to the 2017 Report, so the OAG's "discipline" of Agent Moore was a "farce" and "in name only." *Id.* at 48, 50. He argues the Court incorrectly viewed the above facts in a light most favorable to the OAG, which is improper at the summary relief stage. *See id.* at 49-50.

In response to Adams' arguments, the OAG claims the Commonwealth Court correctly applied the governing legal standards, and this case is distinguishable from *Javitz*. The OAG notes that, in *Javitz*, the employee advanced concrete facts indicating that after her good faith report: (1) her performance evaluations started to decline; (2) her employer relocated her to a new office; and (3) her employer started diminishing her responsibilities and involvement within the office. *See* OAG's Brief at 16-17. By contrast, Adams fails to aver any tangible changes in his employment. Instead, his Complaint is grounded in his "belief that he was the most qualified candidate for" promotion. *Id.* at 17 (citations omitted). According to the OAG, this "belief" is merely "a subjective assessment

of himself and other employees" and insufficient for a *prima facie* case. *Id.* (citations omitted).

The OAG also challenges the import of Adams' evidence. For example, it claims the "stray comment" of an OAG employee calling him a "rat fuck" is "hearsay" and should have no bearing on the motion for summary relief.[9] OAG's Brief at 18 (citation omitted). Likewise, the OAG agrees with the Commonwealth Court that Adams' evidence shows antagonistic behavior from his colleagues **before and after** the 2017 Report, which undermines his causation argument. *See id.* at 13. The OAG also points out that he did not assert "he was excluded from [the boys' club] **because of** his whistleblowing." *Id.* (emphasis in original; citation omitted). Therefore, the OAG posits, even if Adams was intentionally not promoted, his evidence only indicates "friendship" or "cronyism" was the underlying basis for these decisions, which is not a basis for relief in whistleblower retaliation cases. *Id.* at 14 (citations omitted).

## III. CASE LAW

"[I]n evaluating the Commonwealth Court's decision to grant summary relief, we examine whether there is any genuine issue of material fact and whether the moving party is entitled to relief as a matter of law." *Pa. Med. Soc'y v. Dep't of Pub. Welfare*, 39 A.3d 267, 276-277 (Pa. 2012). To this end, "we must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material

---

[9] In response, Adams argues that the Pennsylvania Rules of Civil Procedure "expressly permit the use of hearsay, including affidavits, expert reports, depositions, and answers to interrogatories, by the non-moving party to create an issue of material fact to defeat a motion for summary judgment." Adams' Reply Brief at 3 (citations omitted). The OAG did not challenge the admissibility of Agent Jordan's testimony concerning the "rat fuck" comment before the Commonwealth Court. Furthermore, the Commonwealth Court did not explicitly exclude the statement. As such, the statement still constitutes evidence of record in this appeal.

fact must be resolved against the moving party." *Id.* at 277 (citation and internal quotation marks omitted). "The summary relief standard … is similar to the summary judgment standard under the Pennsylvania Rules of Civil Procedure." *Id.* at 276 n.11 (citation omitted).

Here, we are tasked with determining whether Adams satisfied the causal connection element, which concerns "a question of law, over which our scope of review is plenary." *Javitz*, 293 A.3d at 578 (citation omitted). Neither party has argued this Court should alter or amend our precedent concerning the Whistleblower Law. Instead, the question is whether the Commonwealth Court correctly applied the law in concluding that Adams failed to establish a causal connection between the 2017 Report and any adverse employment consequences.

The Whistleblower Law is a "remedial measure intended to enhance openness in government and compel the government's compliance with the law by protecting those who inform authorities of wrongdoing." *O'Rourke v. Commonwealth*, 778 A.2d 1194, 1202 (Pa. 2001) (citations and internal quotation marks omitted). It is not intended to punish employers, but instead, it is a safeguard for employees who have reported wrongdoings, defying risk and harm to their careers. *See id.* at 1203. "[T]he purpose of whistleblower statutes is to protect employees who risk their own job security by going above and beyond the call of duty by reporting infractions of law that are hidden." *Rohner v. Atkinson*, 118 A.3d 486, 492 (Pa. Cmwlth. 2015) (citation and internal quotation marks omitted); *see also Sea v. Seif*, 831 A.2d 1288, 1292 (Pa. Cmwlth. 2003) ("[T]he overall purpose of the Whistleblower Law [is] to encourage government employees to come forward with information necessary to protect the public interest even where that information is damaging to the agency which employs them."). Section 3(a) of the Whistleblower Law outlines the protections for employees who expose wrongdoing:

**(a) Persons not to be discharged.**--No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority an instance of wrongdoing or waste by a public body or an instance of waste by any other employer as defined in this act.

43 P.S. § 1423(a). As pertinent in the appeal *sub judice*, a *prima facie* case of a violation of Section 3(a) requires a showing, by a preponderance of the evidence, that an employee submitted a "good faith" report of "wrongdoing." 43 P.S. § 1424. If it is a case of retaliation, the employee must also show a "causal connection" between their good faith report of wrongdoing and an adverse employment action.[10] *See Golaschevsky*, 720 A.2d at 759.

Once an employee satisfies these requirements, the burden shifts to the employer to prove that its actions were lawful pursuant to Section 4(c) of the Law, which states:

**(c) Defense.--** It shall be a defense to an action under this section if the defendant proves by a preponderance of the evidence that the action by the employer occurred for separate and legitimate reasons, which are not merely pretextual.

43 P.S. § 1424(c). In *O'Rourke*, this Court explained that the "subjective motivation[s] of the employer" are immaterial to whether an action is "separate" under Section 4(c). *O'Rourke*, 778 A.2d at 1203. *O'Rourke* explicitly held that to rebut a *prima facie* case of retaliation "the employer must prove that it would have taken the same adverse employment action absent the employee's good-faith report of wrongdoing." *Id.* at 1204 (citation omitted). Therefore, *O'Rourke* stands for the proposition that, "to encourage good faith reporting of illicit activities and for the protection of those who actually make

---

[10] The causation standard was first expressed by the Commonwealth Court in *Gray v. Hafer*, 651 A.2d 221 (Pa. Cmwlth. 1994), *aff'd*, 669 A.2d 335 (Pa. 1995) (*per curiam*). *See Javitz*, 293 A.3d at 579. Four years later, in *Golaschevsky*, this Court explicitly adopted the causation standard. *See id.* at 580 (*citing Golaschevsky*, 720 A.2d at 759).

good faith reports[,]" employers must bear the burden of proving that their actions occurred for reasons "separate from the report of wrongdoing." *Id.* at 1205. Once an employer satisfies this burden, then "the burden shifts back to the employee to prove that the reasons offered are merely pretextual." *Javitz*, 293 A.3d at 579 n.10 (citation omitted).

Adams and the OAG quarrel over whether the Commonwealth Court's decision aligns with *Javitz*. In that case, this Court reaffirmed language from *Golaschevsky* indicating that employees must show "concrete facts or surrounding circumstances" in order to "establish a causal connection." *Javitz*, 293 A.3d at 582. However, *Javitz* clarified that direct evidence is not required to satisfy this "concrete facts" requirement. *See id.* at 582 n.13 (finding that *Golaschevsky* "does not mandate direct evidence to establish the causal connection"). We determined that "concrete facts" can include circumstantial evidence, as long as it is "evidence of a fact or set of facts from which the existence of the fact to be determined may reasonably be inferred." *Id.* (citation omitted); *see also Carpenter*, 295 A.3d at 33 ("A causal connection between the report of alleged wrongdoings and negative employment acts can be demonstrated by circumstantial evidence." (*citing Golaschevsky*, 720 A.2d at 759)).

This Court also reiterated that an employee's own "perception of the facts [indicating] that the employer engaged in antagonistic conduct after the report" is not a "concrete fact." *Javitz*, 293 A.3d at 582 (stating that an "employee's conclusory perception of how others treated him after making a report of alleged wrongdoing" cannot establish a *prima facie* case of causation (citation omitted)). This holding echoed the *Golaschevsky* Court's determination that an employee's perception is insufficient for establishing causation because such perceptions are "obviously colored by [the employee's] interest in proving that [they are] a victim of retaliatory discharge." *Id.* at 581 (*citing Golaschevsky*, 720 A.2d at 760). The *Javitz* Court explained that the employee in

*Golaschevsky*[11] failed to make a *prima facie* showing of causation because his evidence rested solely on "self-serving conclusions of an antagonistic post-report workplace and [his] subsequent discharge[.]" *Id.* at 583. However, while the *Javitz* Court faulted the employee in *Golaschevsky* for not "offer[ing] evidence of pre-report positive performance evaluations that were followed by post-report negative reviews," it did not hold that such evidence is **required** for a *prima facie* case. *Id.* Rather, *Javitz* held that an employee "cannot rely on self-serving conclusions of an antagonistic post-report workplace[.]" *Id.* at 583. Instead, to satisfy their burden, the employee needs to proffer "evidence of facts supporting an inference of a pattern of post-reporting antagonism[.]" *Id.* at 585.

Traditionally, precedent interpreting the Whistleblower Law has indicated that temporal proximity between the report and the adverse employment action is insufficient to prove causation. *See Gray*, 651 A.2d at 225 ("To make out a cause of action under the Whistleblower Law … that person must make more than a general statement that a report was filed and, within a given amount of time, the employee was fired as a result."); *Evans v. Thomas Jefferson Univ.*, 81 A.3d 1062, 1070-1071 (Pa. Cmwlth. 2013) ("[T]he mere fact that the discharge occurred a few months after a report of wrongdoing and that

---

[11] Also, in *Golaschevsky*, this Court found the fact that the employer encouraged the employee to submit a report relevant to its causation analysis. *See Golaschevsky*, 720 A.2d at 760. The *Javitz* Court, in a footnote, pointed out this aspect of the *Golaschevsky* decision, while not espousing an opinion on whether this was proper. *See Javitz*, 293 A.3d at 582 n.12. Thus, our precedent suggests that whether the employer encourages the employee to blow the whistle is material to the causation analysis, but **it is not dispositive on its own.**

Here, the Commonwealth Court, like this Court in *Golaschevsky*, considered evidence that the OAG purportedly encouraged Adams to file a report. *See Adams,* 563 M.D. 2017, at 21-22. Adams disputes the Commonwealth Court's characterization of this evidence and argues the OAG instead **discouraged** a thorough investigation. While our precedent indicates that an employer's response to its employee's report is material, whether the OAG actually encouraged Adams' report here is in dispute. Therefore, at this stage of proceedings, we must view this evidence in the light most favorable to Adams as the non-moving party. *See Pa. Med. Soc'y*, 39 A.3d at 277.

the first formal negative actions by the employer occurred after the report are **not** enough to show a causal connection." (citations omitted)).

But despite this historic skepticism, more recent case law implies that temporal proximity can be sufficient in narrow circumstances. The *Javitz* Court, in a footnote, recognized how retaliation cases under the Pennsylvania Human Relations Act (PHRA),[12] Title VII of the Civil Rights Act of 1964, and the First Amendment utilize similar frameworks to assess whether a plaintiff sufficiently established a causal connection. *See Javitz*, 293 A.3d at 585 n.20. In support, this Court acknowledged, but did not adopt, a two-factor test from *Ferraro v. Temple University*, 185 A.3d 396 (Pa. Super. 2018), a PHRA retaliation case, holding that a plaintiff can prove causation through "either (1) an unusually suggestive temporal proximity between the protected activity and the alleged retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Javitz*, 293 A.3d at 585 n.20 (*citing Ferraro*, 185 A.3d at 405). Citing *Rosati v. Colello*, 94 F. Supp. 3d 704 (E.D. Pa. 2015), we also implied that, when considering whether proximity between the report and the purported retaliation implies causation, "[d]ays are suggestive; months are not[.]" *Javitz*, 293 A.3d at 585 n.20 (*citing Rosati*, 94 F. Supp. 3d at 717). Since *Javitz*, one Commonwealth Court panel has applied the two-factor *Ferraro* test to a Whistleblower Law case. *See Doyle v. Monroe Cnty. Transp. Auth.*, 325 A.3d 1045, *8 (Pa. Cmwlth. 2024) (unreported). Therefore, temporal proximity between a report and the alleged retaliation is indeed relevant to this Court's inquiry, but it is seldom sufficient for a *prima facie* case.[13]

---

[12] Act of Oct. 27, 1955, P.L. 744, *as amended*, 43 P.S. §§ 951-963.

[13] Likewise, a gap between the report and the retaliation, in isolation, is not a sufficient basis for an employer to defeat a *prima facie* case of causation. *See Farneth v. Pa. State Police*, 347 A.3d 1150, *5 (Pa. Cmwlth. 2025) (unreported) (finding the employer had "not pointed to any authority which would bar a Whistleblower Law claim after a specific period of time"). While timing is a relevant consideration, an employer cannot evade the Law's
(continued…)

## IV. APPLICATION

Applying this case law to the facts, we agree with Adams that the Commonwealth Court's decision is erroneous. As will be discussed, the Court erred by ignoring "concrete" evidence, improperly weighing the evidence, disregarding issues of material fact, and not viewing the evidence in the light most favorable to the non-moving party.

From the outset, the Commonwealth Court noted that "the fact that [Adams] was denied available promotions and/or positions after the [2017] Report, standing alone, is insufficient to establish a causal connection between the [2017] Report and the adverse employment actions." *Adams*, 563 M.D. 2017, at 16 (citations omitted). This initial observation of the Commonwealth Court is plainly correct under our case law. The first adverse employment action alleged by Adams is his non-promotion to the Narcotic Agent III position, which he interviewed for on April 19, 2017, and months later, on July 13, 2017, the OAG promoted another agent to this position. *See id.* Our courts have found temporal proximity insufficient, unless the adverse employment action occurs mere days after the report. *See Evans*, 81 A.3d at 1070-1071; *Doyle*, 325 A.3d at *8 ("[D]ays are suggestive; months are not[.]" (*citing Rosati*, 94 F. Supp. 3d at 717)). The adverse employment actions alleged by Adams are simply not within the narrow zone of immediacy for courts to find causation on timing alone.

However, Adams' arguments on causation do not rely only on temporal proximity. He cites concrete facts indicating that he was not promoted, in part, because of the 2017 Report. For example, Agent Jordan testified that: (1) an attorney at the OAG referred to

---

protections by simply biding its time to retaliate. *See McAndrew*, 982 F. Supp. 2d at 506-507 ("Although a temporal gap between whistleblowing and adverse employment action often rebuts an inference of causation, in this case the time gap equally permits an inference that defendants waited for an opportune moment to retaliate[.]").

Adams as a "rat fuck"[14] and refused to prosecute one of his cases; (2) the 2017 Report "played a role" in Adams not being promoted to Narcotics Agent III position in Fall 2017; and (3) the 2017 Report "contributed" to Agent Howe's decision to not assign Adams to one of the Safe Streets positions. Jordan Deposition at 23, 33, 40. This evidence, viewed in the light most favorable to Adams, is capable of establishing that the 2017 Report affected the OAG's process in filling these positions. An employee's burden to establish a *prima facie* case is not an "onerous" one. *Golaschevsky*, 720 A.2d at 761 (Nigro, J., concurring) (citation omitted). All this Court requires is "**some evidence** of a connection between the report of wrongdoing and the alleged retaliatory acts." *Javitz*, 293 A.3d at 584 (emphasis in original; citation omitted).

The above facts and testimony are more than "vague and inconclusive circumstantial evidence[.]" *Evans*, 81 A.3d at 1070 (citations and brackets omitted). To establish a *prima facie* case, "concrete facts" must "connect the report with the dismissal." *Golaschevsky*, 720 A.2d at 759. Adams' evidence demonstrates that the 2017 Report contributed to the OAG's decisions regarding promotion and opportunity for overtime pay, explicitly connecting the report to the alleged retaliatory acts. A *prima facie* case of causation requires nothing more. This case is distinguishable from other situations where "there is not even an innuendo of any nexus between an employee's report … and his termination[.]" *Bailets v. Pa. Tpk. Comm'n*, 123 A.3d 300, 309 (Pa. 2015) (citation and internal quotation marks omitted).

Moreover, the Commonwealth Court improperly dismissed this evidence by framing it as proof of a boys' club, not of retaliation. *Adams*, 563 M.D. 2017, at 20 ("While giving preferential treatment to members of the boys' club may be unfair, it does not

---

[14] Agent Jordan confirmed that he interpreted the OAG's comment to be calling Adams a "rat" because of the 2017 Report. *See* Jordan Deposition at 24.

establish a causal connection between the [2017] Report and the adverse employment actions." (italics and citation omitted)). It is true that Adams' evidence suggests there is a clique of agents and attorneys associated with Blair County in the OAG, who help each other in hiring decisions and have received preferential treatment for promotions. His evidence also implies that other reasons, beyond the 2017 Report, may have motivated the OAG's decision to not promote him. For example, Agent Jordan readily acknowledged that "other factors" contributed to Adams not being promoted to Narcotics Agent III, and that the 2017 Report was not the "specific reason" for why Adams was not assigned to Safe Streets. *See* Jordan Deposition at 36, 40.

However, our precedent has never required an employee to prove the absence of non-retaliatory reasons for the employer's conduct, in order to establish a *prima facie* case of causation. To wield the protections of the Whistleblower Law, an employee need not show that retaliation is the **only explanation** for the employer's conduct. Rather, an employee only needs to demonstrate "**some** evidence **of a connection** between the report of wrongdoing and the alleged retaliatory acts." *O'Rourke*, 778 A.2d at 1200 (emphases added; citation omitted). Once an employee satisfies this burden, linking the report to a retaliation action, the burden shifts to the employer to prove that its actions "occurred for separate and legitimate reasons[.]" 43 P.S. § 1424(c); *see also O'Rourke*, 778 A.2d at 1204 (holding that an employer, in order to rebut a *prima facie* case of retaliation, must "prove that it would have taken the same adverse employment action absent the employee's good-faith report of wrongdoing" (citation omitted)). Therefore, it is the **employer's burden** to prove that other separate and legitimate reasons rationalize its actions. Requiring employees to illustrate that retaliation is the only justification for their employers' conduct is inconsistent with our case law and undermines the principles behind the Whistleblower Law.

Here, the Commonwealth Court's sole task was to determine whether Adams established a *prima facie* case, not to assess whether the OAG could rebut Adams' *prima facie* case.[15] Adams cited evidence explicitly linking the 2017 Report to adverse employment actions. For example, Agent Jordan testified that the 2017 Report "played a role" in Adams not being promoted and "contributed" to Agent Howe's decision to not assign Adams to one of the Safe Streets positions. *See* Jordan Deposition at 33, 40. When considering whether the employee has advanced a *prima facie* case of causation, it is outside the trial court's role to independently weigh the evidence to consider whether there are non-retaliatory reasons for the employer's conduct.[16] Once a link is made, it is the employer's burden to demonstrate that "separate and legitimate" reasons justify its actions. *See* 43 P.S. § 1424(c). At that point, the court can consider whether the employer met its burden by a preponderance of the evidence. *See id.*

By interpreting Adams' evidence as not supporting an inference of retaliation, but instead evidence of a boys' club, the Commonwealth Court also failed to view the record in the light most favorable to Adams. His evidence, on its face, indicates the 2017 Report "was certainly a factor" in the OAG's hiring decisions, although "other factors" (not being part of the boys' club) may have played a role as well. *See* Jordan Deposition at 36. It

---

[15] In its application for summary relief, the OAG argued that "legitimate business reasons" justified its actions. *See* OAG's Application for Summary Relief, 3/1/2024, at 2. However, in its briefing to the Commonwealth Court, the OAG did not develop this argument or otherwise elaborate how "separate and legitimate reasons" explained its conduct. 43 P.S. § 1424(c).

[16] Once a plaintiff satisfies their burden of proving a *prima facie* case, the defendant, to succeed at the summary relief stage, must adduce evidence that, if believed, is sufficient to establish a separate and legitimate reason for the adverse employment action **and** the plaintiff must fail to adduce evidence, if believed, sufficient to show that the separate and legitimate reason is pretextual. Of course, at this stage, the trial court "must view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party." *Pa. Med. Soc'y*, 39 A.3d at 277 (citation and internal quotation marks omitted).

is **the OAG's burden** to demonstrate that any adverse employment decision would have been the same in the absence of the 2017 Report. *See O'Rourke*, 778 A.2d at 1204. Thus, contrary to the Commonwealth Court's decision, Adams is only required to establish that the 2017 Report contributed to the subsequent adverse decisions made by the OAG.

Further, the Commonwealth Court considered the fact that the OAG contacted Agent Sinisi for the Field Training Agent course and promoted him to the Narcotics Agent III Gun Violence Unit position, despite his involvement in the "good faith report of harassment." *Adams*, 563 M.D. 2017, at 20 (citation omitted). The Court determined this fact made "it less likely" that retaliation was the reason why the OAG did not promote Adams. *Id.* at 20-21. This analysis is improper. When a party's facts support "conflicting inferences," courts are not to assess whether certain inferences are more or less likely at the summary relief stage. *Washington v. Baxter*, 719 A.2d 733, 740 n.10 (Pa. 1998) ("Where the facts can support conflicting inferences, it cannot be said that the case is free and clear from doubt and thus ripe for summary judgment." (citation omitted)). The appropriate standard is whether a genuine dispute of material fact exists. Here, the Commonwealth Court improperly weighed the evidence instead of assessing whether there was a genuine issue of fact.

The Commonwealth Court also erred by disregarding Adams' allegations as merely "self-serving conclusions of antagonistic behavior." *Adams*, 563 M.D. 2017, at 21. As noted above, we have repeatedly held that an employee's "conclusory perception" of antagonism is insufficient. *Javitz*, 293 A.3d at 582 (*citing Golaschevsky*, 720 A.2d at 759-760). However, if an employee proves "concrete facts or surrounding circumstances from which the factfinder can draw the inference that the employer's conduct was

antagonistic[,]" then an employee can link this antagonism to the filing of the report. *Id.* at 582-583 (footnote omitted).

Here, Adams advanced the following concrete facts, demonstrating antagonistic behavior: (1) an attorney at the OAG referred to him as a "rat fuck"; (2) Agent Howe would rather "give up" the Safe Street positions than give one to Adams; and (3) Agent Brandt refused to accept Agent Page's evaluation of Adams' performance as "outstanding."[17] Jordan Deposition at 23, 39; Adams' Brief at 27. This evidence is distinguishable from evidence which this Court found insufficient and nothing more than "perception" in *Javitz* and *Golaschevsky*. *See Javitz*, 293 A.3d at 585 (finding the employee's claim of the "rude behavior of her supervisors" to be her "subjective perception"); *Golaschevsky*, 720 A.2d at 759-760 (finding the employee's claims of "retaliatory actions, including negative performance evaluations, lack of cooperation from fellow employees and supervisors, withholding of information regarding computer software" to be "nothing more than [the employee's] perception" and insufficient to prove causation). Adams has advanced concrete facts, linking his report to adverse employment outcomes. The Commonwealth Court erred by dismissing it, "wholesale," as mere "perception." *Javitz*, 293 A.3d at 585.

The Commonwealth Court also erroneously determined Adams could not prove a causal link because the OAG's antagonistic behavior was "the same before and after" the 2017 Report. *Adams*, 563 M.D. 2017, at 21. This conclusion disregards evidence of record. While some evidence suggested certain coworkers may have disliked Adams before his report, Adams also presented ample evidence drawing an explicit link between

---

[17] As mentioned *supra*, Adams also relies upon Agent Musser's testimony that Agent Brandt should not have been promoted because Adams is a superior candidate. *See* Adams' Brief at 40. While this testimony is "perception," it is the perception of another individual, not Adams' own perception. Since it is not "self-serving," Agent Musser's testimony remains relevant to the causation inquiry. *See Javitz*, 293 A.3d at 583.

the 2017 Report and his failure to be promoted.[18]  Furthermore, the presence of antagonism prior to the 2017 Report does not vitiate Adams' case.  Unpopular and ostracized employees are still afforded protection under the Whistleblower Law.[19] Evidence pre-dating and post-dating an employee's report, showing a marked shift in the employer's treatment, is arguably the most persuasive evidence to prove causation because it is heavily suggestive of retaliatory motives.  *See Javitz*, 293 A.3d at 585.  But while this evidence is compelling, employees seeking protection under the Whistleblower Law are not required to show sterling performance evaluations before the report of wrongdoing, and abysmal evaluations after the report.  All that is required is a **causal link** between the employee's report and the employer's antagonism.  *See id.* at 582-583 (stating that an employee needs to provide "concrete facts … from which the factfinder can draw the inference that the employer's conduct was antagonistic" (footnote omitted)).

Here, Adams has articulated concrete facts linking the 2017 Report to adverse employment actions.  He attached his resume along with the resumes of other individuals who were promoted over him.   The experience of candidates can be "objectively established in their resumes."  *Carpenter*, 295 A.3d at 35.  "This is not mere 'personal perception.'"  *Id*.  Adams' evidence indicates the 2017 Report "played a role" in the decision not to promote him to Narcotics Agent III position and that the 2017 Report "contributed" to a supervisor's decision not to assign Adams to one of the Safe Streets positions.  *See* Jordan Deposition at 33, 40.  He presented deposition testimony showing that individuals within the OAG considered him to be a "rat," refused to prosecute his

---

[18] For example, the "rat" remark is evidence, outside of Adams' own perceptions, capable of establishing that at least some antagonism directed towards Adams resulted from his 2017 Report.

[19] In fact, an employee's alienation from his or her coworkers could be a result of the employee's refusal to countenance or participate in inappropriate or illegal behavior, which occurred before the good faith report of wrongdoing.

cases, and would rather "give up" employment opportunities than provide them to Adams. *Id.* at 23, 39. Moreover, Adams' evidence suggests he was not selected for training opportunities, and a supervisor interfered with his annual performance evaluation rating. Once Adams demonstrated a link between his protected conduct and adverse employment actions, the burden shifted to the OAG to prove those actions were wholly separate from his protected conduct. Therefore, the Commonwealth Court erred and misapplied our Court's precedent interpreting the Whistleblower Law.

## V. Conclusion

"Some evidence of a connection between the report of wrongdoing and the alleged retaliatory acts" is all the Whistleblower Law demands. *Javitz*, 293 A.3d at 584 (emphasis and citation omitted). We vacate the Commonwealth Court's order and remand for further proceedings consistent with this opinion.[20]

Chief Justice Todd and Justices Donohue, Dougherty, Wecht, Mundy and Brobson join the opinion.

---

[20] As noted *supra* at 7 n.7, the Commonwealth Court rejected the OAG's arguments that the 2017 Report was not a "good faith" report. *See Adams*, 563 M.D. 2017, at 8-12. However, the Court did not respond to the OAG's argument that, under the Whistleblower Law, the 2017 Report did not concern a "wrongdoing." *See id.* at 22 n.12. On remand, the Commonwealth Court should address the OAG's remaining issue as to whether Adams established a *prima facie* case that his good faith report pertained to a "wrongdoing."